WHITE'S IOWA MANUAL LABOR INSTITUTE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
White's Iowa Manual Labor Inst. v. Commissioner
Docket No. 14190-90
United States Tax Court
T.C. Memo 1993-364; 1993 Tax Ct. Memo LEXIS 376; 66 T.C.M. (CCH) 389; August 18, 1993, Filed *376 Decision will be entered for petitioner. For petitioner: Ronald L. Mountsier. For respondent: Jeffrey A. Schlei. SHIELDS
SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Year
Deficiency
1986
$ 31,759
1987
20,426
1988
29,410
After concessions, the only issue for decision is whether the amounts received during 1986, 1987, and 1988 by petitioner from a grain and livestock operation are included in or excluded from petitioner's unrelated business taxable income under section 512(b)(3). [1]
FINDINGS OF FACT The facts in this case have been fully stipulated by the parties pursuant to Rule 91 and are so found. Their stipulation and the attached exhibits are incorporated by reference. White's Iowa Manual Labor *377 Institute (hereinafter referred to as the Institute or petitioner) is an Iowa nonprofit corporation which is exempt from Federal income tax under section 501(c)(3). For the years in issue, petitioner filed Forms 990, Return of Organization Exempt from Income Tax, with the Internal Revenue Service Center, Kansas City, Missouri. The Institute's administrative offices are located in New Providence, Iowa. It provides residential youth care at four campuses for boys and girls between the ages of 11 and 17 who have been adjudicated to be delinquent, in need of assistance, or on probation. The Institute also licenses and supervises foster homes and family support services. Petitioner has owned a 510-acre farm in Lee County, Iowa, since 1852. The farm is located approximately 150 miles from petitioner's campuses and administrative offices. For some time prior to April 2, 1988, the farm was used to raise cattle and grain under an oral agreement which petitioner had entered into with Dorothy J. Coffin. Thereafter the operation of the farm was subject to a written agreement [2] (executed on April 2, 1988). The parties agree that the written agreement accurately reflects their prior oral *378 agreement. *379 No general fund as referred to in paragraph 11 of the agreement was maintained by the parties, but certain expenses such as the cost of public liability insurance and hail and fire insurance on undivided property were shared by the parties and paid from undivided funds. From the stipulation of the parties, we find that during the years 1986, 1987, and 1988, petitioner's Lee County farm and the farming operation conducted thereon were subject to the agreement between petitioner and Ms. Coffin. In general, the parties agreed as follows: (1) Petitioner agreed to lease to Ms. Coffin petitioner's Lee County Farm including the 510 acres of land, farm buildings, and other farm improvements such as fences for the purpose of raising cattle and grain; (2) in the operation of the farm Ms. Coffin agreed to be responsible for all farm equipment, labor, and other expenses except the parties were to share (a) any machine cost for combining grain other than corn, (b) the net cost after refunds of gas, oil, electricity, commercial fertilizer, cattle and seed, and (c) the cost of liability insurance, as well as the cost of hail and fire insurance on any undivided property; (3) all cattle and grain *380 purchased or raised in the operation of the farm were to be jointly owned; and (4) in the operation of the farm, all decisions with regard to the purchase, sale, and care of crops and livestock were to be made solely by Ms. Coffin except that any purchase of livestock in excess of $ 2,500 required the approval of petitioner. In actual operation during 1986, 1987, and 1988, farm expenses were borne by the parties as follows: Expense
Petitioner
Tenant
Machinery and labor not
specifically covered
100%
New fences - labor
100%
New fences - material
100%
Bailing and corn harvesting
100%
Combining - machine cost
50%
50%
Repairs - buildings
100%
Gas, oil, electricity
50%
50%
Gas tax (refund)
50%
50%
Seed
50%
50%
Commercial fertilizer
50%
50%
Government payments (refunds)
50%
50%
Lime
100%
Government payments (refunds)
100%
During the years under consideration petitioner received from Ms. Coffin and sold at its discretion elevator receipts for petitioner's share of all grain produced on the farm. Ms. Coffin sold the livestock and delivered to petitioner its share of each sale less petitioner's share of expenses associated with both livestock *381 and grain production. For the years at issue, petitioner reported to respondent income and expenses associated with the Lee County Farm as follows: 1986 1987 1988 Gross receipts from sale
of grain and livestock
$ 140,926
$ 99,350
$ 108,001
Split crop-share expenses
57,064
37,606
39,746
Gross profit from crop-
share agreement
83,862
61,744
68,255
Petitioner expenses other
than crop-share expenses:
Repairs
2,741
6,664
3,899
Machine hire-outside
1,900
2,908
2,520
Property taxes
8,940
14,164
4,466
Insurance
1,099
1,307
2,144
Miscellaneous
720
858
1,707
Depreciation expense:
Buildings
633
643
511
Special purpose bldg.
(confinement, etc.)
5,246
5,492
5,997
Grain bins
1,239
1,257
1,007
Tiling (land)
658
658
658
Machinery
739
706
732
Total other expenses
23,915
34,657
23,641
Net rental income
59,947
27,087
44,614
In the notice of deficiency respondent determined that: As there is substantial sharing of the farming expenses between [petitioner] and its tenant farmer, the determination of the amounts of the payments to [petitioner] is based in whole or in part on the income or the *382 profits of the farm. Therefore, under section 512(b)(3)(B)(ii), such rental income is included in the calculation of the unrelated business taxable income.
On brief, respondent contends that petitioner and Ms. Coffin were partners or joint venturers in the operation of the farm, and that the payments to petitioner constituted petitioner's share of the profit from the operation and are taxable as unrelated business taxable income. Petitioner admits that the farming operation is unrelated to its exempt purpose, but contends that the payments received from Ms. Coffin constitute rents from real property which are excluded from unrelated business taxable income (UBTI) under section 512(b)(3)(A). OPINION Section 511 imposes a tax on the unrelated business taxable income of a tax exempt organization. Section 512(a) defines unrelated business taxable income as "the gross income derived by an organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b)." *383 Under section 512(b)(3)(A), rents from real property and personal property leased with such real property are excluded from UBTI and are not subject to tax unless "the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales)." Sec. 512(b)(3)(B)(ii). 1. Rent Versus Return of Profit
On brief, respondent asserts for the first time that petitioner and Ms. Coffin were partners or joint venturers in the operation of the farm. More specifically, respondent contends that the amounts paid by Ms. Coffin to petitioner constitute petitioner's share of the profit from the farm operation and not rent payments which are excludable from UBTI under section 513(b)(3)(A). Petitioner contends that since respondent first raised this theory on brief respondent has the burden of proof with respect to it. Moreover, petitioner argues that the relationship between the parties was that of landlord and tenant, and that the payments received by petitioner constituted rent, which is excludable from UBTI. With certain exceptions *384 not present here, it is well settled that a taxpayer bears the burden of proof on any issue raised in a notice of deficiency. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, when respondent subsequently makes an assertion which requires the taxpayer to present different evidence from that which is required by the notice of deficiency, respondent may have introduced a new matter on which respondent has the burden of proof. Achiro v. Commissioner, 77 T.C. 881, 890 (1981). In this fully stipulated case, respondent has raised for the first time on brief and after the execution of the stipulation of facts the contention that petitioner and Ms. Coffin were joint venturers or partners in the operation of the farm while in the deficiency notice respondent merely determined that the amounts received by petitioner were based in whole or part on the profit from the property and were includable in UBTI under section 512(b)(3)(B)(ii). We conclude, therefore, that respondent's contention that the parties were partners or joint venturers constitutes a new matter since to refute such a contention would require the production *385 by petitioner by stipulation or otherwise of facts different from those necessary to refute respondent's original determination. However, we note that petitioner has generally addressed the new issue on brief by contending that the agreement constituted a crop-share lease and that "under Iowa law, [crop-share leases which are a normal business practice in Iowa] have been repeatedly held to be leases, creating a landlord-tenant relationship, and not creating a partnership, join venture, or similar arrangement for the sharing of profits and losses." Furthermore, petitioner has not claimed prejudice by respondent's new assertion. Under these circumstances we will consider respondent's contention. The general guidelines for determining whether a partnership exists for Federal tax purposes were stated by the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733 (1949). Under those guidelines, we must examine "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the * * * conduct of the enterprise". Culbertson, Id. at 742. In Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964), *386 we listed the factors to be considered when determining whether a partnership or joint venture exists as follows: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.
With the above factors in mind we now review the parties' agreement and their conduct thereunder in order to determine whether or not such factors *387 tend to establish a partnership or joint venture. First we note that the agreement required each party to make a substantial contribution to the farming operation; i.e., petitioner contributed [3] 510 acres of farm land plus farm buildings and other permanent farm improvements while Ms. Coffin contributed all other farm equipment, labor, and expenses except certain items which were to be shared such as gas, oil, electricity, cattle, grain, and machine hire for combining grain other than corn. With such contributions it is apparent that under the agreement both parties were principals in the operation. However, they were not co-proprietors "sharing a mutual proprietary interest in the net profits" and "an obligation to share losses" because petitioner was entitled only to 50 percent of the receipts from the sale of cattle and grain and under the agreement petitioner had no right to any part of the net profits and had no responsibility for any net losses from the farm operation. *388 Furthermore, the parties did not file partnership returns with respondent or otherwise represent to respondent or to other persons with whom they dealt that they were partners or joint venturers in the farm operation, or that they exercised mutual control over or assumed mutual responsibility with respect to the enterprise or its debts or expenses. In fact, petitioner and respondent have stipulated that under the agreement for the operation of the farm all decisions with regard to the purchase, sale, and care of crops and livestock were to be made solely by Ms. Coffin with the exception that any purchase of livestock in excess of $ 2,500 required the approval of petitioner. The record does not reflect whether the exception with respect to the purchase of cattle was ever applicable during the years under consideration. The written agreement executed by the parties is of little help in determining the relationship of the parties. The document is entitled "Articles of Agreement" and the fourth paragraph thereof states that "The business to be carried on under this agreement shall be farming, and the division of the profits resulting therefrom shall be as follows". Admittedly similar *389 language is often found in partnership agreements. However, in the second and third paragraphs of the agreement, the document is referred to on three occasions as a lease. Overall we find that the document constitutes a crop-share lease. Generally speaking such a lease is an agreement between a landowner and a farmer regarding a farming operation conducted by the latter on land owned by the former. See Oblinger Trust v. Commissioner, 100 T.C. 114 (1993); United States v. Myra Found., 382 F.2d 107 (8th Cir. 1967); Moore Charitable Trust v. United States, 812 F.Supp. 130 (C.D. Ill. 1993). In each of the cited cases a contention by respondent, that the parties to crop-share leases were partners or joint venturers, was rejected. Even petitioner's agreement in this case to pay one-half of the farm's expenditures for gas, oil, electricity, seed, and fertilizer does not change our conclusion. The sharing of such costs is not uncommon in such agreements. See Oblinger Trust v. Commissioner, supra; United States v. Myra Found., supra. *390 Although Ms. Coffin was required to consult with petitioner prior to making a purchase of livestock in excess of $ 2,500, such requirement is of no consequences here because there is no indication in the record that such consultation ever actually occurred in the operation of the farm. We also disagree with respondent's argument that petitioner's right under the agreement to demand an accounting was an indication that a partnership or joint venture existed. We disagree, because where, as in this case, the amounts payable to the landowner are based on receipts from the sale of cattle and grain, the right to demand an accounting merely constitutes a sensible, and possibly the only, method for the landowner to confirm the correctness of the amounts received. We conclude, therefore, that under all the facts and circumstances involved in this case the parties did not operate the farm as a partnership or joint venture. Oblinger Trust v. Commissioner, supra. See also Commissioner v. Culbertson, supra; Luna v. Commissioner, supra.Instead, on this record, we are convinced and so *391 find that petitioner and Ms. Coffin dealt with each other as landlord and tenant and that the amounts received by petitioner pursuant to their agreement constituted rents. 2. The Exclusion of the Rents from UBTI
We turn now to a consideration of whether the rents determined above qualify for exclusion from unrelated business taxable income. Section 512(b)(3)(A) excludes from UBTI rents received from real property and personal property leased with such real property. However, "if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales)", then the rents are not excluded from UBTI. Sec. 512(b)(3)(B)(ii). Section 1.856-4(b)(3), [4] Income Tax Regs., provides that "an amount will not qualify as 'rents from real property' if, considering the lease and all the surrounding circumstances, the arrangement does not conform with normal business practice but is in reality used as a means of basing the rent on income or profits." *392 As stated in Oblinger Trust v. Commissioner, supra at 122, section 512(b)(3)(B)(ii) "is intended to prevent avoidance of unrelated business income tax where a profit-sharing arrangement will, in effect, make the lessor an active participant in the operation of the property." Here respondent, in effect, argues that petitioner and Ms. Coffin split the expenses of the farm in such a manner that petitioner received a share of the resulting profit from the enterprise. Petitioner counters that there was no direct relationship between the amounts received by petitioner and the profits or losses realized from the farm operation. We begin by noting that petitioner and Ms. Coffin did not share all expenses. As set forth in our findings, they shared some equally, and Ms. Coffin agreed to pay the substantial operating expenses; i.e., machinery and labor costs, while petitioner agreed to pay certain other costs which primarily affected the value of the farm; i.e., materials to repair buildings, fences, and other improvements, and lime to improve or maintain the quality of the soil. The parties did not compute or attempt to estimate the profit from the farm *393 and base the rent on a percentage of that amount. Instead, petitioner received 50 percent of the farm's gross receipts from the sale of cattle and grain without regard to whether or not the farm ultimately made a profit or loss or the amount thereof. Furthermore, in the event of an ultimate net loss petitioner was not responsible for any part of it. Consequently, under the parenthetical clause in section 512(b)(3)(B)(ii), the amounts paid petitioner are fixed percentages of receipts or sales and as such qualify for exclusion from UBTI. Oblinger Trust v. Commissioner, supra.
Decision will be entered for petitioner. Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The agreement reads as follows: Articles of Agreement
This agreement made and entered into this 2nd day of April, 1988, by and between the Trustees of White's Iowa Manual Labor Institute, hereinafter referred to as Party of First Part, and Dorothy J. Coffin, hereinafter referred to as Party of Second Part. The Parties of the First Part have leased 510 acres of land in Lee County all in Cedar Township to the Party of the Second Part. This lease to begin March 1, 1988 and continue to March 1, 1993. Either party in this agreement has the option of discontinuing of [sic] this lease on the same terms and conditions by giving either party written notice thereof on or before September 1. The business to be carried on under this agreement shall be farming, and the division of the profits resulting therefrom shall be as follows: 1. All livestock and grain are to be joint properties, i.e. all grain grown on the farm or purchased from joint funds is to remain joint property and all livestock purchased from joint funds is to remain joint property. The division on these items is to be in equal amounts. 2. All machinery and labor not specifically covered here is to be furnished by parties of the Second Part. 3. The Parties of the Second Part agree to furnish the labor on any new fences and the Party of the first Part agrees to furnish the material. 4. The Parties of the Second Part agree to do all baling and corn harvesting without expense to the Party of the First Part. 5. The machine cost for combining other grain than corn shall be on a per acre cost and shall be fifty-fifty. 6. In the event that repairs are needed to any of the buildings on the farm, the Party of the First Part agrees to furnish same and pay for the delivery thereon. 7. Each party agrees to pay for one-half of the gas, oil and electricity for the farm and each party shall share in the gas tax refund in the same proportion. 8. Each party is to furnish one-half of the seed to be-used on the farm. 9. Each party is to pay one-half of the commercial fertilizer and in the event that there would be any government payments for this practice they are to be divided equally. 10. The Party of the First Part agrees to furnish all lime used on the premises and in the event that there are government payments for this practice they will become the property of the Party of the First Part. 11. Insurance will be carried and paid for out of the general fund to protect all parties of this agreement against any legal liability that should arise because of any action on said farm, the intent being that public liability insurance will be carried. Hail insurance and fire insurance on all undivided property may be carried, and same to be paid for out of undivided money. 12. The Party of the Second Part shall render at any time an accounting to the Party of the First Part and in addition thereto the Party of the First Part will provide an annual audit and report of the farm operation. 13. In the event of dissolution and in the further event that the parties hereto cannot agree to a division in kind, each party shall appoint an arbitrator and the two arbitrators thus appointed will select an additional arbitrator themselves. The said three member arbitration board shall make a division in kind and the findings of that arbitration board shall be final with no right of appeal on either side. 14. Before any livestock purchases are made in excess of $ 2500.00, both parties shall agree thereto.
SIGNED PARTIES OF FIRST PART Chairman, Kenneth Cook Secretary, Dan Vander Linden Treasurer, Lloyd Stangeland SIGNED PARTIES OF SECOND PART Dorothy J. Coffin↩
3. Either party could terminate the agreement on Sept. 1 of each year. Therefore, contributions by each party were for a single crop year.↩
4. Made applicable by sec. 1.512(b)-1(c)(2)(iii)(b), Income Tax Regs.↩